IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JESSE J. LANGMAN           :      CIVIL ACTION
                                    :
     v.                       :
                                    :
KEYSTONE NAT'L BANK & TRUST   :      NO. 07-2662
CO., et al.                    :

MEMORANDUM

Dalzell, J.                       November 23, 2009

James H. Langman died on November 1, 2001 and was survived by six children from his first marriage ("First Marriage Children"). He second marriage ended in divorce before his death. James and his second wife had one child, Jesse Langman, who is the plaintiff in this case. The fight over James's will in the Orphans' Court of Lehigh County ("Orphans' Court"), In re: Estate of James H. Langman, 2002-0438 ("Orphans' Court Proceedings" or "OCP"), is a lengthy tale worthy of comparison to Jarndyce v. Jarndyce from Charles Dickens's Bleak House. Incredibly, it appears that there may still be unresolved issues regarding the probate of James's will between the First Marriage Children -- to whom James left relatively little -- and Jesse. See Jesse Langman Dep., Keystone Ex. 1 at 627-30.

Jesse is or was the beneficiary of three trusts that both of his parents created -- the Deer Park, Terlinqua, and Hanford Trusts -- as well as the Allis Trust, which his mother

alone created. Jesse Langman Responses to Wiener Defendants' Interrogatories, Wiener Ex. QQ at ¶ 7. Jesse asserts claims against the defendants in <u>this</u> case for, <u>inter alia</u>, abuse of process regarding disputes in the Orphans' Court over how these trusts interacted with the assets in James's estate ("Estate").

There are seven defendants in this diversity case, and for simplicity's sake we will group them into four categories. Stephen W. Wiener and his law firm, Wiener & Wiener, LLP ("Wiener Defendants") represented both administrators of the Estate. Constantine M. Vasiliadis and his law firm, Kolb, Vasiliadis and Florenz, LLP ("Vasiliadis Defendants"), represented the First Marriage Children. Sandra Langman, Jesse's half-sister, was the first administrator of the Estate.[1] After Jesse moved to remove Sandra as administrator, and the Orphans' Court accepted her subsequent resignation from that post, that Court named the Trust Company of Lehigh County as the second administrator. That entity subsequently merged with defendant Keystone Nazareth Bank & Trust Company, and C. Palmer Zigmund represented the Trust

---

[1] Sandra has notified the Court that she no longer intends to defend herself in this lawsuit, and we granted her counsel's motion to withdraw on August 17, 2009. Jesse's motion for entry of default judgment against Sandra remains pending, and we will address that motion at a later date. In this opinion, we will address only the four motions for summary judgment.

Company/Keystone in the Orphans' Court. We refer to these last two defendants collectively as "Keystone Defendants," and we also refer to the Trust Company as "Keystone."

Neil Hendershot, who is not a party to this case, represented Jesse's trusts in the underlying case. Neil Hendershot Dep., Wiener Ex. J, at 25-26.

In our Orders of September 25 and September 29, 2008, we dismissed some of the claims in Jesse's complaint, including that for wrongful use of civil process pursuant to the Dragonetti Act, 42 Pa. C.S.A. § 8351, et. seq. But we concluded that Jesse had pled sufficient facts to support a common law tort claim for abuse of process as to the Wiener, Keystone, and Vasiliadis Defendants. Jesse has also asserted a claim on his own behalf and on behalf of the Deer Park Trust against the Keystone and Wiener Defendants -- the second Estate administrator and its counsel -- for breach of fiduciary duty. For the reasons we discuss at length below, we will grant defendants' motions for summary judgment on the abuse of process and breach of fiduciary duty claims because Jesse failed to assert those claims within the two-year statute of limitations that applies to both claims.

Jesse "inform[ed]" us that he will not pursue his action for conversion against the Keystone Defendants. Pl. Brief

at 15. We will therefore grant as unopposed the Keystone
Defendants' motion for summary judgment on that claim.

## I.  Facts

The outcome of defendants' motions for summary judgment
regarding Jesse's compliance with the statute of limitations
depends on the chronology of defendants' actions, and the facts
we recite below focus on that issue. We provide some other facts
to explain the context in which the parties were operating in the
Orphans' Court. Because the burden is on the parties to point us
to relevant facts in the voluminous record, we have not embarked
on an unguided tour of the parties' documents but instead focus
on the facts that they have brought to our attention in their
motions, responses, and briefs. "Judges are not like pigs,
hunting for truffles buried in briefs" -- or, for that matter, in
the thousands of pages of record that accompany them. United
States v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991).

### A.   Jesse Langman's Trusts

Before James's death, Jesse's parents established four
trusts and named him as the beneficiary of each. His mother was
the sole grantor of the Allis Trust, but both of his parents were
the grantors for the Deer Park, Hanford, and Terlinqua Trusts.

4

<u>See</u> Attachment to Pl. Ex. 91, Affidavit and Affirmation to Internal Revenue Service, at ¶¶ 1-4. The property of these trusts was at the center of the Orphans' Court dispute, and Jesse has also in this case asserted a breach of fiduciary duty claim against the Wiener and Keystone Defendants on behalf of himself and the Deer Park Trust.

### B.   **Administrators of Estate**

Jesse's half-sister Sandra Langham was the first administrator of James's estate. Jesse filed a petition to remove Sandra from that position, and she then resigned. The Orphans' Court accepted her resignation on January 7, 2003.[2] Orphans' Court Order, January 7, 2003, Wiener Ex. D at 1. The Orphans' Court appointed Keystone as the successor administrator, and the Court ordered Jesse to deliver to Keystone within ten days all of his father's assets and records, "including but not limited to tangible personal property, mail, business records, tax returns and personal records." Wiener Ex. D at 2. The parties' dispute regarding when and how completely or honestly Jesse complied with

---

[2] The text of the Order is dated January 7, 200<u>2</u>, but the Order is time-stamped January 7, 2003. Given the context surrounding the Order, it is a fair assumption that the Court actually signed it in 2003.

5

that Order is not relevant to our resolution of the defendants'
motions.

### C.   The 1992 Will Versus the 1995 Will

The parties also sparred in the Orphans' Court about
which of James's purported wills should be probated. Initially,
his will dated June 26, 1992 ("1992 Will") was submitted to
probate. Under the terms of that will, the six children from
James's first marriage would each receive $1,000.00,[3] and Jesse
would receive nothing because, as the will stated, James had
already provided for him. See 1992 Will, Wiener Ex. B. In the
1992 Will, James also directed that his personal property should
go to his wife or, if she predeceased him, to five of the First
Marriage Children and Jesse. Alan Kinney was appointed executor,
and Miriam Langman was appointed as the substitute executor. See
1992 Will. As discussed above, for reasons not relevant to the
motions at hand, Sandra Langman became the 1992 Will's first
administrator, and Keystone (then Trust Company of Lehigh County)

---

[3] Kevin Langman would also receive "the old shotgun, [James]
found as a boy in Oxford, N.Y., plus a 12 gauge shotgun, 20 gauge
shotgun, and a 25-20 rifle." Wiener Ex. B at 1.

was the second administrator.[4]

In August of 2003, Jesse filed an appeal contending
that the Register of Wills should revoke probate of the 1992 Will
and instead admit to probate James's later will, which was dated
November 20, 1995 ("1995 Will"). Jesse Langman Appeal, OCP,
Wiener Ex. K. Pursuant to the 1995 Will, Jesse would have been
appointed executor, the six First Marriage Children and other
individuals not involved in this case would have received modest
sums, and Jesse would have received all of James's other
property. See 1995 Will, Wiener Ex. L.[5] On January 9, 2004, Jesse
withdrew his appeal to submit the 1995 Will to probate, and the
1992 Will was duly probated. See Praecipe to Withdraw Appeal,
OCP, January 9, 2004, Wiener Ex. N.

_____

[4] Though all of James's assets outside the Trusts were the
subject of his Wills, the Orphans' Court itself referred to
Sandra as "administratrix" and Keystone as "administrator."
Weiner Ex. D.  To conform with the record, therefore, we follow
this admittedly confused nomenclature.  Compare executor ("[a]
person named by a testator to carry out the provisions in the
testator's will") with administrator ("[a] person appointed by
the court to manage the assets and liabilities of an intestate
decedent."), Black's Law Dictionary 651 (def. 2), 52 (def. 2)
(9th ed. 2009).

[5] Under the terms of the 1995 Will, Kevin Langman would have
received $5,000.00 and James's "shotgusns [sic] and a 25-20
riftle [sic]," as well as "all of [James's] fishing poles, lures,
tackle boxes, nets, and related fishing gear." 1995 Will at ¶¶ 5-
6.

**D.  The Underlying Dispute Regarding the
    Trusts' Petitions for Permission to Sell Property**

On December 31, 2003, Jesse and his trusts filed
petitions in the Orphans' Court seeking, <u>inter alia</u>, confirmation
that the trusts could sell their real property. The Deer Park
Trust appeared to own two parcels of farm land in Lehigh County.
<u>See</u> Petition of the Deer Park Trust, OCP, December 31, 2003,
Wiener Ex. T, at ¶¶ 16, 61, and page 13. The Deer Park Trust
stated in the petition that it wanted to sell the land to satisfy
its potential estate tax burden. <u>Id.</u> at ¶¶ 60-61. The Terlinqua
Trust owned an apartment building in Slatington, Pennsylvania.
Petition of the Terlinqua Trust, OCP, December 31, 2003, Wiener
Ex. U at ¶¶ 8, 14, 17. The Terlinqua Trust sought judicial
confirmation that it could sell the apartment building. <u>Id.</u> at
11-12. The Wiener Defendants filed a response to both petitions
on behalf of the Keystone Defendants on March 22, 2004. Responses
to Petitions, OCP, Wiener Ex. X, Y; Jesse Langman Dep. at 419-20.

Jesse filed motions for summary judgment in the
Orphans' Court regarding both petitions on June 4, 2004. Motions
for Summary Judgment, OCP, Wiener Ex. Z, AA. Among other things,
he contended that Keystone filed its response to the trusts'
petitions three days late. <u>See</u> Wiener Ex. Z at ¶ 33; Wiener Ex.

AA at ¶ 29. On July 6, 2004, the Wiener Defendants filed the Estate's responses to the motions for summary judgment, and a month later they filed amended responses. <u>See</u> Wiener Ex. BB, CC, DD, EE; Jesse Langman Dep. at 421-22. Jesse knew about all of these filings by August of 2004. <u>See</u> Jesse Langman Dep. at 419-22.

In Jesse's brief in response to the defendants' motions for summary judgment in <u>this</u> case, he does not identify any facts to support a claim that defendants did anything else regarding the OCP after August of 2004. At some point before the Orphans' Court ruled on June 30, 2005, the defendants apparently agreed to withdraw their opposition to the trusts' property sales, but that conciliation can hardly be considered a fact that supports Jesse's claim for <u>abuse</u> of process. According to Jesse, the only other actions in the OCP after August of 2004 were the Orphans' Court's rulings, and those are (obviously) not acts of the defendants.

The Orphans' Court approved the sale of the Deer Park and Terlinqua properties on July 15 and September 24, 2004, but the Court ordered the funds to be deposited into an escrow account. <u>See</u> Order, OCP, June 30, 2005, Wiener Ex. HH. After the First Marriage Children and the Estate withdrew their opposition

9

to the motions for summary judgment, the Orphans' Court granted those motions on June 30, 2005. <u>See</u> Order, OCP, June 30, 2005, Wiener Ex. HH. The Orphans' Court also released the proceeds of the property sales to the trusts to be administered in accordance with their escrow agreements with the Internal Revenue Service. <u>See</u> Order, OCP, June 30, 2005, Wiener Ex. HH.

### E.   <u>Federal Estate Tax Return</u>

Part of Jesse's claims arise out of the defendants' supposed mishandling of the Estate's federal tax return. The parties disagree regarding what documents the Estate needed in order to file that return, who had them, and when the Estate received them. There is no dispute, however, that the return was filed late and that the Wiener Defendants submitted it to an auditor at the IRS on October 1, 2004. Letter from Stephen W. Wiener to Mr. Almassy, Internal Revenue Service, and IRS Form 706, October 1, 2004, Wiener Ex. JJ. Jesse believed in October of 2004 that the return was inaccurate. Jesse Langman Dep. at 425. The Wiener and Keystone Defendants apparently conceded the Estate tax issues in favor of Jesse and the trusts on November 22, 2005.

As mentioned above, the outcome of defendants' motions depends on the statute of limitations, so we will not belabor the

10

specific facts regarding the parties' dispute over the Estate tax
return, which had to do with which trust assets should be counted
in that return. The only relevant question, it turns out, is
whether Jesse has pointed to any facts to demonstrate that
defendants committed either abuse of process or breach of
fiduciary duty regarding the tax issues during the statute of
limitations period, which, as we explain below, began on June 27,
2005. Jesse only points to the billing records of the Wiener
Defendants and the trusts' counsel as evidence of defendants'
actions during that time. Pl. Br. at 7-8, 15. To place those
records in context, we discuss them below in our analysis of
Jesse's claims for breach of fiduciary duty.

## II.  **Analysis**[6]

---

[6]Summary judgment is appropriate if there is no genuine
issue of material fact and the moving party is entitled to
judgment as a matter of law.  Fed. R. Civ. P. 56(c).  In ruling
on a motion for summary judgment, the Court must view the
evidence, and make all reasonable inferences from the evidence,
in the light most favorable to the nonmoving party.  Anderson v.
Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).  Whenever a
factual issue arises which cannot be resolved without a
credibility determination, at this stage the Court must credit
the non-moving party's evidence over that presented by the moving
party.  Liberty Lobby, 477 U.S. at 255.
    The moving party bears the initial burden of proving that
there is no genuine issue of material fact in dispute.
Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S.
574, 585 n.10 (1986). Once the moving party carries this burden,

11

Defendants have moved for summary judgment on Jesse's claims for abuse of process and breach of fiduciary duty, and we will grant the motions on those claims because we conclude that Jesse failed to file them within the applicable two-year statute of limitations.

### A.    **Abuse of Civil Process**

We previously dismissed Jesse's claim for wrongful use of civil proceedings because the focus of that cause of action is the initiation of civil proceedings, and we held that defendants' actions here -- responding to Jesse's petitions and motions in the OCP -- could not fairly be construed in that way. See Order, September 29, 2008 at ¶¶ l-m. But we allowed Jesse to proceed

---

the nonmoving party must "come forward with 'specific facts showing there is a genuine issue for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)).  The non-moving party must present something more than mere allegations, general denials, vague statements, or suspicions.  Trap Rock Indus., Inc. v. Local 825, 982 F.2d 884, 890 (3d Cir. 1992); Fireman's Ins. Co. of Newark v. DuFresne, 676 F.2d 965, 969 (3d Cir.1982).  It is not enough to discredit the moving party's evidence, the non-moving party is required to "present affirmative evidence in order to defeat a properly supported motion for summary judgment." Liberty Lobby, 477 U.S. at 257 (emphasis in original).  A proper motion for summary judgment will not be defeated by merely colorable or insignificantly probative evidence. See Liberty Lobby, 477 U.S. at 249-50.  Also, If the non-moving party has the burden of proof at trial, then that party must establish the existence of each element on which it bears the burden. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

with his claim for abuse of civil process, a tort that may arise at any time during the proceedings. See U.S. Express Lines, Ltd. v. Higgins, 281 F.3d 383, 394 (3d Cir. 2002) (noting this historical distinction).

In their initial briefs and reply brief,[7] defendants assail Jesse's claim for abuse of process on several grounds. They argue that (1) abuse of process is no longer a source of relief under Pennsylvania law,[8] (2) the statute of limitations expired for Jesse's claim before the date on which he filed his complaint, and (3) he has failed to point to facts in the record to support the elements for his claim for abuse of process, particularly that the defendants acted with an improper motive.

Before proceeding further, a note of explanation regarding the defendants' statute of limitations argument[9] may be

---

[7] The Wiener and Keystone Defendants filed a joint reply brief, and the Vasiliadis Defendants joined that reply brief with respect to the statute of limitations issue for plaintiff's abuse of process claims and damages. We will therefore refer to one reply brief in this section, as the Vasiliadis Defendants did not add anything substantive to the Wiener/Keystone reply.

[8] There is no dispute that Pennsylvania law applies to Jesse's state law claims.

[9] The Keystone and Wiener Defendants argued in the briefs supporting their motions for summary judgment that the statute of limitations barred Jesse's abuse of process claim. The Vasiliadis Defendants joined in this argument in their second motion for

helpful. Jesse filed this complaint on June 26, 2007, and he
agrees that the statute of limitations for his abuse of process
claim is two years. See Pl. Br. at 9. The statute of limitations
period had to be triggered no earlier than June 27, 2005.

Jesse argues that we should apply the continuing
violations doctrine to grant relief for defendants' acts that
occurred prior to the statute of limitations period. Under that
equitable doctrine, "when a defendant's conduct is part of a
continuing practice, an action is timely so long as the last act
evidencing the continuing practice falls within the limitations
period; in such an instance, the court will grant relief for the
earlier related acts that would otherwise be time barred." Cowell
v. Palmer Twp., 263 F.3d 286, 292 (3d Cir. 2001) (internal
quotations omitted). "The focus of the continuing violations
doctrine is on affirmative acts of the defendants," and it is not
sufficient for Jesse simply to claim that defendants' acts before
the statute of limitations period continued to harm him during
that period. Id. at 293 ("The mere existence of the liens does
not amount to a continuing violation. Neither was the Township's
refusal to remove the lien an affirmative act of a continuing

---

summary judgment.

14

violation."). To survive the defendants' motions for summary
judgment on this issue, Jesse must point to some evidence
regarding <u>defendants</u>' acts  -- that defendants did <u>something</u> --
that abused process after June 27, 2005.

Jesse argues that to be successful on his abuse of
process claim, he must show that the underlying proceedings
terminated in his favor, pursuant to the Dragonetti Act, 42 Pa.
C.S.A. § 8351(a). <u>See also</u> 42 Pa. C.S.A. § 8354. He contends that
the termination of the OCP -- the Orphans' Court's resolution of
the motions for summary judgment in his and the trusts' favor on
June 30, 2005 -- occurred within the statute of limitations
period and that he could not have raised a claim for abuse of
process until that occurred. Defendants claim that Pennsylvania
courts do not require plaintiffs to show favorable termination of
proceedings for an abuse of process claim and that plaintiff's
claim accrued much earlier. <u>See</u> Reply Br. at 6 (reciting the
elements for abuse of process and not including favorable
termination). Defendants contend that the statute of limitations
for this claim expired before June 26, 2007 and move for summary
judgment, <u>inter alia</u>, on that basis.

As we explain below, we agree with defendants that
Jesse is not obliged to show that the OCP terminated in his favor

15

to succeed on his abuse of process claim. Viewed in the light
most generous to Jesse, this claim accrued not when the Orphans'
Court granted his requested relief on June 30, 2005 -- or, as he
suggests, when that Order became final thirty days later, Pl. Br.
at 9 -- but when the defendants filed their final responses to
the motions for summary judgment in the OCP in August of 2004.
Jesse knew about these responses at that time[10] and has pointed
to no other acts of defendants after August of 2004 that could
constitute abuse of process. We agree with defendants that Jesse
has failed to show that he filed his abuse of process claim
within the two-year period, and we will thus grant defendants'
motion for summary judgment on this claim.

### 1.   Abuse of Process is Still a Valid Claim Under Pennsylvania Law

It is true that in 2006 the Supreme Court of

---

[10] Jesse's own emails show that he was considering bringing
a Dragonetti Act claim by April 1, 2005 at the latest. See Email
from Jesse Langman to Neil Hendershot, Apr. 1, 2005 (in text of
Email from Neil Hendershot to Jesse Langman, Apr. 1, 2005),
Keystone Ex. 29. To the extent that it is relevant, therefore,
there is no question that Jesse was aware of this kind of claim
and could have brought it within the statute of limitations.
Under the jurisprudence of our Court of Appeals, "the continuing
violations doctrine should not provide a means for relieving
plaintiffs from their duty to exercise reasonable diligence in
pursuing their claims." Cowell, 263 F.3d at 295.

Pennsylvania held that the torts for malicious use of process --
another name often used for wrongful use of civil proceedings --
and abuse of process were "subsume[d]" by the Dragonetti Act,
which is codified at 42 Pa. C.S.A. § 8351. Stone Crushed P'ship
v. Kassab Archbold Jackson & O'Brien, 908 A.2d 875, 877 n.1 (Pa.
2006). Four years before Stone Crushed, our Court of Appeals
anticipated this result when it stated that wrongful initiation
of civil process and abuse of process "are subsumed within the
general scope of the [Dragonetti] Act, which includes persons who
take part in the procurement, initiation or continuation of civil
proceedings for wrongful purposes." Higgins, 281 F.3d at 394. See
also A.G. Cullen Const., Inc. v. Travelers Cas. & Sur. Co. of
America, 08-cv-1238, 2009 U.S. Dist. LEXIS 11683 at *19 (W.D. Pa.
2009) (noting that the Dragonetti Act covers malicious use of
civil proceedings and abuse of process).

The Vasiliadis Defendants argue that we should
interpret these statements to mean that abuse of process is no
longer available as a source of relief in Pennsylvania and that
Jesse must seek relief only under the statute. But that is
plainly inaccurate. See, e.g., Lerner v. Lerner, 954 A.2d 1229,
1237-39 (Pa. Super. 2008) (discussing the distinction between a
claim for abuse of process and a Dragonetti Act claim for

17

wrongful use of civil proceedings).

## 2. <u>Elements of Abuse of Process</u>

While it is clear that the cause of action for abuse of process still <u>exists</u> in Pennsylvania, the courts have given a surprising response to the comment of the Third Circuit and Pennsylvania Supreme Court that the Dragonetti Act "subsume[d]" the common law tort for abuse of process. <u>The Oxford English Dictionary</u> defines <u>subsumed</u>, <u>inter alia</u>, as "To bring (one idea, principle, term, etc.) <u>under</u> another, (a case, instance) under a rule; to take up <u>into</u>, or include <u>in</u>, something larger or higher." XVII <u>The Oxford English Dictionary</u> 75, def. 4 (2d ed. 1989) (emphasis in original). If abuse of process has been "subsumed" into the Dragonetti Act, one might expect that a plaintiff seeking to assert a claim for abuse of process must plead the elements that the Dragonetti Act specifies in 42 Pa. C.S.A. § 8354, including termination of the proceedings in the plaintiff's favor.[11]

_____

[11]    The elements of a cause of action pursuant to the Dragonetti Act are as follows:

A person who takes part in the procurement, initiation or continuation of civil proceedings against another is subject to liability to the other for wrongful use of civil proceedings:

But the Pennsylvania state and federal courts --
including our Court of Appeals -- have <u>not</u> taken that approach.
We thus begin on less than firm ground in the always perilous[12]
task of predicting state law, here what Pennsylvania law requires
of Jesse to show that there is a genuine issue of trial-requiring

---

(1) He acts in a grossly negligent manner or without
probable cause and primarily for a purpose other than that
of securing the proper discovery, joinder of parties or
adjudication of the claim in which the proceedings are
based; and
(2) The proceedings have terminated in favor of the person
against whom they are brought.

42 Pa. C.S.A. § 8351(a).

The Act specifies that a plaintiff must prove five distinct
elements:
(1) The defendant has procured, initiated or continued the
civil proceedings against him.
(2) The proceedings were terminated in his favor.
(3) The defendant did not have probable cause for his
action.
(4) The primary purpose for which the proceedings were
brought was not that of securing the proper discovery,
joinder of parties or adjudication of the claim on which the
proceedings were based.
(5) The plaintiff has suffered damages as set forth in
section 8353 (relating to damages).

42 Pa. C.S.A. § 8354.

[12]<u>See</u> Dolores K. Sloviter, <u>A Federal Judge Views Diversity
Jurisdiction Through the Lens of Federalism</u>, 78 Va. L.Rev. 1671,
1679-81 n. 53 (1992), where Judge Sloviter discusses the
difficulty of making "<u>Erie</u> guesses" and cites specific cases in
which federal predictions of state supreme courts' rulings proved
wrong.

material fact regarding his abuse of process claim.

Despite the "subsumption" statements, time and again Pennsylvania courts and federal courts applying Pennsylvania law require plaintiffs seeking to recover for abuse of process to prove the three traditional common-law elements, but <u>not</u> the statutory elements in §§ 8351 or 8354. For example, in 2008 the Superior Court of Pennsylvania in <u>Lerner</u> distinguished between the Dragonetti Act requirements -- which it applied to a wrongful use of civil proceedings claim -- and the elements for an abuse of process claim. <u>Lerner</u>, 954 A.2d at 1237-39. That Court stated that "'[t]o establish a claim for abuse of process it must be shown that the defendant (1) used a legal process against the plaintiff, (2) primarily to accomplish a purpose for which the process was not designed; and (3) harm has been caused to the plaintiff.'" <u>Id.</u> at 1238 (quoting <u>Shiner v. Moriarty</u>, 706 A.2d 1228, 1236 (Pa. Super. 1998)). Importantly for the issues in this case, "'it is immaterial . . . even that the proceedings terminated in favor of the person instituting or initiating them.'" <u>Id.</u>, 954 A.2d at 1238 (quoting <u>Rosen v. American Bank of Rolla</u>, 627 A.2d 190, 192 (Pa. Super. 1993 (quoting Restatement (Second) of Torts § 682))). Moreover, in a case that our Court of Appeals decided the year after <u>Higgins</u>'s "subsumed" statement,

20

that later panel analyzed a motion to dismiss an abuse of process claim using the common-law elements and did not even <u>mention</u> the elements listed in §§ 8351 or 8354. <u>General Refractories Co. v. Fireman's Fund Ins. Co.</u>, 337 F.3d 297, 304 (3d Cir. 2003) ("Generally speaking, to recover under a theory of abuse of process, a plaintiff must show that the defendant used legal process against the plaintiff in a way that constituted a perversion of that process and caused harm to the plaintiff.").

Since <u>Higgins</u> and <u>Stone Crushed</u>, courts have consistently held or assumed that plaintiffs asserting a claim under Pennsylvania law for abuse of process that arises out of an underlying civil case need only establish the three common law elements described above. <u>See, e.g.</u>, <u>O'Hara v. Hanley</u>, No. 08-cv-1393, 2009 WL 2043490, *11-*12 (W.D. Pa. Jul. 8, 2009) (quoting <u>Shiner</u>, 706 A.2d at 1236, in its discussion of the requirements for claims arising out of civil cases and stating that abuse of process requires the three common law elements but malicious use of civil proceedings requires the five elements in § 8354); <u>Roofers Local 30 Combined Welfare Fund v. Union Roofing Contractors, Inc.</u>, No. 07-1714, 2008 WL 4716862, *2 n.2 (E.D. Pa. Oct. 21, 2008) (DuBois, J.) ("Although section 8351 covers the 'continuation of civil proceedings,' Pennsylvania courts continue

to distinguish between statutory malicious use of process under
the Dragonetti Act and common law abuse of process which is
generally defined by reference to the Restatement (Second) of
Torts § 682 and Pennsylvania case law."); Wolk v. Teledyne
Industries, Inc., 475 F.Supp.2d 491, 511 (E.D. Pa. 2007)
(Shapiro, J.) (stating that Pennsylvania law requires the three
common law elements for abuse of process); Synthes (U.S.A.) v.
Globus Medical, Inc., No. 04-cv-1235, 2007 WL 1001587, *4 (E.D.
Pa. Mar. 29, 2007) (Stengel, J.) (citing Restatement (Second) of
Torts § 682 and General Refractories); Glover v. Bally Total
Fitness Corp., No. 06-CV-1548, 2007 WL 465578, *3 (M.D. Pa. Feb.
9, 2007) (same); Holst v. Oxman, No. 05-cv-0220, 2006 WL 724520,
*6 (E.D. Pa. Mar. 17, 2006) (Surrick, J.) (employing the three
common law elements for abuse of process); Finney v. Royal Sun
Alliance Ins. Co., No. 04-cv-1086, 2005 WL 2106576 at *3-*4, *7
(W.D. Pa. Aug. 29, 2005) (stating that a plaintiff must prove the
elements in § 8354 for a claim of wrongful use of civil
proceedings, but only the three elements that we quoted from
Shiner for abuse of process); United States ex rel. Magid v.
Wilderman, No. 06-cv-4346, 2005 WL 469590, *3 (E.D. Pa. Feb. 28,
2005) (Surrick, J.) (distinguishing between claims for malicious
use of process and malicious abuse of process, despite our Court

22

of Appeals's "subsumed" comment in <u>Higgins</u>, and holding that because the underlying proceeding had not yet concluded, the malicious use of process claim -- but not the abuse of process claim -- was unripe); <u>Cruz v. Princeton Ins. Co.</u>, 972 A.2d 14, 15 n.1 (Pa. Super. 2009) (stating that a plaintiff asserting an abuse of process claim need only prove the three elements in <u>Shiner</u> and not mentioning the § 8354 elements).

Jesse has cited -- and we have found -- no judicial voice against this chorus of support for the defendants' belief that Jesse need not show that the underlying proceedings terminated in his favor in order to succeed on an abuse of process claim. <u>See</u> Reply Br. at 6 (citing the common law elements for abuse of process). Jesse only notes that Pennsylvania law "prefers statutory remedies over common law," Pl. Br. at 9 (citing 1 Pa. C.S.A. § 1504), but he does not refer to any case in support of his contention that he <u>must</u> show favorable termination to succeed on his abuse of process claim.

We can only conclude that Jesse is not required to show favorable termination to assert an abuse of process claim.

### 3.   <u>Abuse of Process and Statute of Limitations</u>

The statute of limitations for an abuse of process

claim "begins to run 'as soon as the right to institute and
maintain a suit arises.'" <u>Sutton v. West Chester Area Sch. Dist.</u>,
No. 03-cv-3061, 2004 WL 999144, *8 (E.D. Pa. May 5, 2004)
(Padova, J.) (quoting <u>Pocono Int'l Raceway, Inc. v. Pocono
Produce</u>, 468 A.2d 468, 471 (Pa. 1983)). Jesse argues that <u>Sutton</u>
does not apply to his case because it addressed a common law
claim for abuse of process and he has pled a statutory claim. But
as we have been at pains to show, despite the declarations from
the Third Circuit and Supreme Court of Pennsylvania that abuse of
process was "subsumed" by the Dragonetti Act, courts applying
Pennsylvania law continue to use the common law approach to
claims for abuse of process. To the extent that a plaintiff has
an abuse of process claim <u>at all</u>, the jurisprudence of
Pennsylvania courts and our Court of Appeals directs us --
paradoxical though it may seem -- to use the common law elements.
<u>Sutton</u> should thus apply to Jesse's abuse of process claim.

Based on the evidence that Jesse cites, the <u>last</u> act of
defendants that could have given rise to his claim for abuse of
process happened in August of 2004, and there is no doubt he
could have filed a suit at that time. On the reading of the
record most generous to Jesse, the statute of limitations for his
abuse of process claim ran in August of 2006, which is well

before the date he filed his complaint here.  Because Jesse

failed to file his claim for abuse of process before the statute

of limitations expired, we will grant the defendants' motion for

summary judgment on that claim.[13]

### B.   Breach of Fiduciary Duty

The Wiener and Keystone Defendants move to dismiss

Jesse's claims for breach of fiduciary duty for, inter alia,

failure to file the claim within the two-year statute of

limitations. See 42 Pa. C.S.A. § 5524(7); Pl. Br. at 12.

---

[13] Jesse also claims that the Wiener and Keystone Defendants
committed abuse of process by filing an inaccurate Estate tax
return on October 1, 2004 and in related actions until the
defendants conceded the tax issues on November 22, 2005. Pl. Br.
at 11. Defendants argue that filing a tax return does not
constitute "process" for the tort of abuse of process, but we
need not reach this issue. In the section of Jesse's brief
addressing the statute of limitations for the abuse of process
claim, he points to no record evidence that the defendants did
anything to abuse process during the statute of limitations
period. See Pl. Br. at 11.

The only event that plaintiff contends occurred during that
period was defendants' capitulation regarding the Estate tax
issues on November 22, 2005 -- an agreement that Jesse says
resolved those issues in his favor. See id. That can hardly be
considered an abuse of process. In Jesse's discussion of the
timeliness of his fiduciary duty claim, which we discuss below,
he similarly fails to meet his burden. Even if filing a tax
return was abuse of process, we conclude that Jesse has pointed
to no evidence that defendants acted in any way during the
statute of limitations period that could constitute an abuse of
process.

"Generally, the statute of limitations begins to run on a breach of fiduciary duty claim when the trustee openly and unequivocally violates his duties." <u>Weis-Buy Services, Inc. v. Paglia</u>, 411 F.3d 415, 422 (3d Cir. 2005). Jesse argues that we should apply the continuing violations doctrine to this claim, but the <u>Cowell</u> framework we discuss above also applies to "claims arising from a trust relationship," such as breach of fiduciary duty. <u>Id.</u> at 423. To survive defendants' motions for summary judgment on these claims, Jesse must therefore point to some <u>act</u> of defendants on or after June 27, 2005 that breached their fiduciary duty to him or Deer Park Trust.

Jesse argues that the Wiener and Keystone Defendants breached their fiduciary duties to him and the Deer Park Trust[14] when, among other things, they submitted the Estate's tax return to the IRS auditor on October 1, 2004.[15] He contends that submitting that return "was but one step in the audit process,

---

[14] Jesse has asserted breach of fiduciary duty claims personally and on behalf of Deer Park Trust.

[15] Jesse argues that other actions of the Keystone and Wiener Defendants fell below the bar of fiduciary duty, but the only acts that happened <u>after</u> June 27, 2005 -- and thus potentially <u>within</u> the statute of limitations period -- are related to the Estate tax return. We will thus limit our discussion of the statute of limitations to the parties' contentions regarding the Estate's tax return.

26

the last act of which occurred on November 22, 2005 when the Bank

[Keystone] and Wiener accepted the IRS['] proposed changes." Pl.

Br. at 14. Jesse claims that after the Keystone and Wiener

defendants submitted the tax return, they "advocated a position

by further correspondence and meetings that exposed the Trusts to

potentially higher taxation and higher fees," but he does not

cite evidence that could lead a reasonable jury to that

conclusion. Id. at 15.

Jesse also argues that his counsel expended great

effort by submitting a "pro forma Federal Estate Tax return" on

August 23, 2004 and writing a letter to the IRS auditor on March

15, 2005. Id. 14 (citing Pl. Ex. 91 and 92).[16] To the extent that

Hendershot's actions shed any light on the issue at hand (which

we doubt), neither of these events occurred within the statute of

limitations period. Jesse also argues that "[i]t is apparent from

defendant Wiener's bills that he engaged in conduct with IRS

[sic] from August, 2005 until his capitulation in November, 2005,

---

[16] Jesse also claims that Hendershot met with the IRS
auditor, and he cites pages 443-447 of Hendershot's deposition to
support this contention. Hendershot's deposition, which is Pl.
Ex. 52, does not include those pages. The Keystone Defendants did
not submit these pages, see Keystone Ex. 12, and neither did the
Wiener Defendants, see Wiener Ex. J. The Vasiliadis Defendants
did not submit any portion of Mr. Hendershot's deposition, and we
thus have no idea of what Jesse refers to here.

shortly before the Bank [Keystone] and he accepted the IRS' proposed changes." Id. at 15. The only evidence that Jesse cites in his initial brief to support this contention is "Exhibit 112," which is apparently a portion of the Wiener Defendants' billing records regarding the OCP. Id. at 8,15. See also Pl. Ex. 112.

In Jesse's Surreply Brief, he again contends that "[t]he record shows that IRS audit process [sic] was ongoing until November 22, 2005," but the only documents he cites in support of that claim are -- again -- the Wiener Defendants' billing records and, puzzlingly, Hendershot's billing records. Pl. Surreply Br. at 4. It is unclear why Jesse believes that the billing records of the trusts' attorney could establish defendants' breach of fiduciary duty, and he does not assist us in understanding his reasoning on that point. Langman simply states that Hendershot's "billing records for the Trusts likewise reflect activity with IRS [sic] with regard to the Estate tax audit." Id. Hendershot's "activity" is irrelevant to the issue at hand.

Jesse does not point to any particular item in Exhibit 112 -- a four-page, single-spaced list -- that he alleges would show that the Wiener or Keystone Defendants committed an act in breach of their fiduciary duty to Jesse or the Deer Park Trust.

28

He has therefore failed to meet his burden of pointing to specific facts in the record to show that there is a genuine issue of material fact regarding whether the Keystone and Wiener Defendants breached their fiduciary duties to him or the Deer Park Trust within the two-year limitations period.

In an abundance of caution, however, we carefully reviewed the exhibit ourselves. We have listed in the table below every item from Exhibit 112 that is within the statute of limitations period -- between June 27, 2005 and the defendants' purported capitulation on the tax issue on November 22, 2005 -- that mentions the IRS or taxes or could possibly be construed to involve those subjects:[17]

| | |
|---|---|
| 7/25/05 | Extended telephone conference with IRS re extension on hold for collection of 2000 and 2001 taxes |
| 8/9/05 | Review file; Telephone call, with message to, Kurt Almassy of IRS re case status |
| 8/10/05 | Extended telephone conference with Kurt Almassy of IRS |
| 8/23/05 | Telephone conference with Palmer Zigmund re: IRS notice |

---

[17] We have eliminated the hours and attorneys' initials, as all of the relevant activities are attributed to "SWW," which we assume refers to Stephen W. Wiener.

29

| 8/23/05 | Review Notice from IRS reducing penalties and interest; Telephone call, with message to, Jan Woffindin |
|---|---|
| 8/24/05 | Letter to Neil Hendershot and William Dayton re: 2000 and 2001 income taxes; Extended telephone conference with IRS re: balances due by Decedent; Legal research regarding priority of IRS interest claim |
| 8/26/05 | Review and revise letter to Neil Hendershot and William Dayton re: IRS Interest and Review and revise Response to Objections to Account by Trusts |
| 9/15/05 | Telephone conference with Palmer Zigmund re IRS Interest payment |
| 10/24/05 | Review  File; Telephone call, with message to, Kurt Almassy of IRS |
| 11/7/05 | E-mail to Neil Hendershot re: Status of Trust information to IRS for estate tax audit |
| 11/22/05 | Telephone conference with Palmer Zigmund re Federal Estate Tax Audit |
| 11/22/05 | Conference with Palmer Zigmund to review Auditor's changes; Letter to Kurt Almassy of IRS |

Pl. Ex. 112.

Based solely on this document -- which is the only possibly relevant evidence that Jesse cites to support his contention that the defendants acted within the statute of limitations to breach their fiduciary duty -- no reasonable juror could agree with Jesse's point on this issue. The document shows only that Wiener billed the Estate for discussing tax issues and

drafting some tax-related documents. These billing records do not indicate _anything_ about the content of any of those conversations or documents, and Jesse has not directed our attention to any other substantive evidence on this point.

Because Jesse has failed to point to any specific facts in the record to show that the Wiener and Keystone Defendants committed any acts that would breach a fiduciary duty during the statute of limitations period, and because the continuing violations doctrine will not apply unless there is some such act during that period, we will grant defendants' motion for summary judgment regarding Jesse's claims for breach of fiduciary duty.

## III.   **Conclusion**

As Jesse failed to file his claims for abuse of civil process and breach of fiduciary duty within the time of the relevant statute of limitations, we will grant defendants' motions for summary judgment on those claims. We will also grant as unopposed the Keystone Defendants' motion for summary judgment on Jesse's conversion claim. Jesse's only remaining claims are those against his half-sister Sandra, and he has moved for an entry of default judgment against her. We will address that motion later.

31

BY THE COURT:

\_\_\s\Stewart Dalzell